## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**The Catholic Store, Inc. d/b/a Queen of Angels Catholic Bookstore,**

     *Plaintiff,*

 v.

**City of Jacksonville,**

     *Defendant.*

Civil Action No.: 3:23-cv-00192

**Verified Complaint**

## Introduction

Independent bookstores serve as beacons of free speech across the American landscape. With limited space and unlimited pressure to distinguish themselves from big chains, small bookstores painstakingly curate their shelves to strike just the right theme—from mystery to feminist to LGBTQ. This editorial freedom enriches American life and creates a beautiful patchwork of diverse options for customers. No government should stifle this diversity by ordering bookstores what to say or which views to affirm, particularly on intense ideological and political debates.

But Jacksonville has done precisely that. Following a disturbing nationwide trend, the City has expanded its public-accommodation law to cover gender-identity discrimination and thereby require businesses to address customers using their preferred pronouns and titles regardless of a customer's biological sex. The law even prevents businesses from publishing "any communication" a customer or government official might subjectively interpret as making someone feel "unwelcome, objectionable, or unacceptable," such as statements opposing gender-identity ideology.

All this in turn puts Jacksonville's law on a collision course with the First Amendment and The Catholic Store, Inc. ("Queen of Angels" or the "bookstore"), a Catholic bookstore in Jacksonville that sells Catholic books,

rosaries, and similar items. The bookstore also publishes a website (with blog) and YouTube channel to promote its Catholic faith and products.

As a Catholic bookstore, Queen of Angels follows Catholic teachings—including the belief that God created everyone in His image, male or female, worthy of equal dignity and respect. The store serves and sells everything in it to everyone regardless of gender identity. That includes customers who present as transgender. The bookstore *just cannot speak* contrary to its beliefs—to affirm, for example, the view that sex can be changed. So the store cannot use customers' pronouns or titles contrary to their biological sex. Queen of Angels wants to put this policy in writing, publish it, and explain its Catholic views on gender identity to customers.

But because Jacksonville's law makes all this illegal, Queen of Angels must instead profess an ideological view it opposes, contradict the message espoused in the very books it sells, and avoid explaining its Catholic beliefs about human sexuality in store and online. In effect, the law requires this Catholic bookstore to stop being fully Catholic. And if it refuses, the store faces cease-and-desist orders, expensive investigations, hearings, uncapped fines, attorney-fee awards, and unlimited damages.

This puts Queen of Angels under immediate threat. Everyday customers visit the store. Everyday Queen of Angels must refrain from formalizing and distributing its pronoun policy and explaining its beliefs

about gender identity. Everyday Queen of Angels faces liability for following its religious beliefs. And everyday Queen of Angels chills its expression to avoid violating the law.

But the government has no need nor right to force Americans to profess ideological views they oppose. Our pluralistic country is big enough and sturdy enough to allow people of good faith to express different views, even when the government disagrees. In fact, the Constitution demands it. And Jacksonville is better for it.

## Jurisdiction and Venue

1.     This civil-rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

2.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiff's federal claims and supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state claim.

3.     This Court has authority to award the requested (1) declaratory relief under 28 U.S.C. § 2201–02, Fed. R. Civ. P. 57, and Fla. Stat. § 761.03(b)(2); (2) injunctive relief under 28 U.S.C. § 1343.

4.     Fed. R. Civ. P. 65, and Fla. Stat. § 761.03(b)(2); and (3) costs and attorneys' fees under 42 U.S.C. § 1988 and Fla. Stat. § 761.04.

5.    Venue is proper here under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims substantially occur within the Middle District of Florida; the effects of the challenged laws are felt here; Defendant can and does perform official duties here; and Defendant resides here.

6.    This case is filed in the Jacksonville Division because Plaintiff and Defendants are all located in Duval County.

## Plaintiff

7.    The Catholic Store, Inc., d/b/a Queen of Angels Catholic Bookstore is a for-profit corporation organized under Florida law with its principal place of business in Jacksonville, Florida.

8.    Queen of Angels' primary business is selling Catholic-oriented books, apparel, home décor, sacramental and liturgical items, and jewelry for a profit.

9.    Christie DeTrude, an individual citizen and resident of Florida, is the sole shareholder, sole director, and sole officer of Queen of Angels.

10.    Queen of Angels is not the corporate parent, subsidiary, or affiliate of a church, religious non-profit organization, or any other entity.

11.    The profits from Queen of Angels' operations solely benefit Ms. DeTrude and any persons, entities, or organizations to which she chooses to direct those profits.

12.     Ms. DeTrude is the store's only fulltime worker but also employs approximately seven people part-time.

## Defendants

13.     The City of Jacksonville, Florida is a municipality endowed under Florida law with the power to sue and be sued. Fla. Const. art. VIII, § 2(b).

## Factual Background

Queen of Angels sells distinctly Catholic products

14.     Queen of Angels operates a brick-and-mortar Catholic bookstore located in the City of Jacksonville, Florida.

15.     Queen of Angels opened its doors in 2003 and has served the Diocese of St. Augustine and the larger Jacksonville community ever since.

16.     Christie DeTrude bought Queen of Angels in 2017.

17.     The previous owner wanted to sell the store to someone who would serve the community in a way that fulfilled Queen of Angels' mission— to be a beacon of Catholic faith to the community.

18.     That was Ms. DeTrude's vision for the store as well, so she readily agreed to operate the store as a distinctly Catholic business.

19.     Queen of Angels is named for one of the devotional titles of Mary, the mother of Jesus.

20.    Queen of Angels' Catholic beliefs shape every aspect of the business, including the products it sells, the décor of its retail space, the content of its website and social media, and its interactions with customers.

21.    Queen of Angels' mission is to strengthen the faith of those within the Church and spread the Gospel to people outside the Church.

22.    Queen of Angels and its owner believes that God has called the store to operate in accordance with Catholic doctrine.

23.    Queen of Angels seeks to magnify God's goodness in the way it serves its customers and to reflect God's love and kindness to all people.

24.    Queen of Angels exercises its editorial judgment to ensure that it only sells products that promote its Catholic faith and that it does not sell products inconsistent with its Catholic faith.

25.    For example, Queen of Angels sells a variety of liturgical items, such as priestly vestments, baptismal and eucharistic supplies, altar linens, and processional crucifixes.

26.    Likewise, Queen of Angels sells books that promote the Catholic faith, including Catholic-approved translations of the Bible, the Catechism of the Catholic Church, daily devotional books based on mediations by Catholic saints, and Catholic theological works that intersect current issues, like Mary Eberstadt's *Adam and Eve after the Pill, Revisited*, which provides a Catholic response to the sexual revolution.

27.     Queen of Angels also sells personal devotional items like rosaries and scapulars, as well as Catholic-themed jewelry, home décor, artwork, and apparel.

28.     Queen of Angels hand-picks each item sold in the store and on the website to ensure that it contributes to the bookstore's theme and mission to promote and uphold its Catholic faith.

29.     As a result, Queen of Angels declines to sell items that would likely be profitable but fail to contribute to the bookstore's mission.

30.     For example, the bestselling book in 2023 to date is Prince Harry's memoir, *Spare*. But, in its editorial discretion, Queen of Angels does not sell that book because it does not align with the bookstore's faith.

31.     Queen of Angels likewise declines to sell scores of expressly Christian books when, in the bookstore's judgment, they either conflict with or do not adequately promote the bookstore's faith and mission, even if selling those books would likely be lucrative.

32.     For example, Queen of Angels does not sell works by many bestselling Christian authors, such as Joel Osteen, Rob Bell, and many others because it chooses to focus instead on works that promote its understanding of the Catholic faith.

Queen of Angels operates as a distinctly Catholic business

33.     Queen of Angels views itself as an extension of the church, and therefore requires its employees to conduct themselves with hospitality and reverence while at work.

34.     Though it is not required, most of the employees attend mass at a local church before beginning their workday.

35.     Queen of Angels conducts organized prayers throughout the day.

36.     Queen of Angels employees pause at noon to recite the Angelus Prayer together—a prayer that recalls the angel Gabriel's announcement to Mary that she would bear the Son of God.

37.     Similarly, at 3:00 p.m. each day, employees pause to recite the Divine Mercy prayer together—a series of prayers that give thanks for God's salvation of the world through Jesus Christ and asks for Him to pour out His mercy on the whole world.

38.     Employees voluntarily lead these prayers.

39.     Customers in the store at those times are welcomed to participate in the prayers.

40.     Visibly observing the Angelus prayer and the Divine Mercy prayer is part of Queen of Angels' Christian witness, and members of the community know Queen of Angels is place they can come to learn more about or participate in these prayers.

41.    Customers frequently ask questions about the Catholic faith.

42.    Customers have expressed to Queen of Angels staff that they are more comfortable asking questions in a store environment than in a church, and Queen of Angels is happy to provide a place where people are comfortable asking questions.

43.    Employees gladly answer customers' questions as they arise and often direct them to local churches and priests for follow-up.

44.    And employees sometimes see customers come to the Catholic faith through their interaction with the store and its employees.

45.    Occasionally, Queen of Angels has a customer who wants to argue about the Catholic church.

46.    Queen of Angels is an easy target for this kind of behavior because it has a physical location and published hours, and because it so clearly promotes Catholic beliefs.

47.    Queen of Angels views these interactions as important opportunities to defend the Catholic faith, demonstrate the love of Christ to people regardless of their attitude toward Catholicism, and dispel misconceptions about Catholic theology.

48.    These interactions have occurred frequently enough to make this a priority for Queen of Angels in their daily operations.

49.    Queen of Angels wants to ensure that the store has the resources available to answer any questions a customer may have.

50.    Queen of Angels also maintains a system to collect customers' and employees' prayer requests.

51.    The store has a glass bowl at the front of the store where prayer requests can be left.

52.    On at least a daily basis, employees pray specifically for these prayer requests.

53.    Sometimes, Queen of Angels passes the request along to local priests and churches in the area for additional prayer.

54.    For example, one customer made a specific prayer request for a cancer diagnosis, the store passed that request along to the local church, and a priest and store employees were able to pray for this customer by name.

55.    Queen of Angels also hosts events for the community, such as book signings and exhibitions for Christian authors and artists.

56.    These events allow the community to meet Christian authors and artists, and hopefully lead some of them to explore the Christian faith.

57.    Queen of Angels also hosts its own community events, such as an annual ceremony and celebration to light its Advent wreath.

58.     This kind of event provides an opportunity for Queen of Angels to teach the community about the Advent season as a period of preparation for the coming Messiah.

59.     Queen of Angels also serves as a location for local patrons to donate their no-longer-used Catholic products, which Queen of Angels helps get to a local church or charity.

60.     All of these activities described above in paragraphs ¶¶ 19–59 are expressions and exercises of Queen of Angels' catholic faith.

61.     And they all make Queen of Angels a business that speaks and practices its faith in the marketplace.

Queen of Angels promotes its Catholic faith online

62.     After purchasing Queen of Angels, Ms. DeTrude created the store's website to promote the store, sell products online, and better communicate the Catholic faith to its customers and the broader community.

63.     Queen of Angels receives online orders through the website.

64.     Online customers can also receive monthly newsletters through a sign-up on the website.

65.     The website also contains a blog, which Queen of Angels uses to discuss and explain the Catholic faith.

66.     Ms. DeTrude has ultimate control of what is posted on the blog.

67.     Contributors to the blog include Ms. DeTrude, store employees, local students, and others whose writing Ms. DeTrude decides to include.

68.     Queen of Angels sees the blog as a way to reach online customers and share its Catholic beliefs with as many people as possible.

69.     But Queen of Angels only uses its blog to further its Catholic beliefs.

70.     The blog's topics center around the current Catholic calendar and current events.

71.     Queen of Angels has written blog posts about many of its Catholic beliefs.

72.     For example, on July 1, 2022, Queen of Angels posted a blog celebrating Independence Day, entitled "All Men are Created Equal." In this post, Queen of Angels celebrated the overturning of *Roe v. Wade* and emphasized how Catholics "still have a duty to defend the sanctity of life."

73.     Queen of Angels also published a blog post about the role of women within the Catholic church, summarizing what spiritual motherhood consists of and the role of women in the Church.

74.     Queen of Angels also hosts and maintains a YouTube page that discusses similar topics to the blog and has videos that align with the current Catholic calendar and current events.

75.     For example, on October 31, 2019, Queen of Angels posted a video discussing a South Carolina priest refusing to offer communion to Joe Biden and explaining the theological reasons the priest rejected Joe Biden's ability to participate in the eucharist.

76.     The YouTube channel also has several different prayers to various saints based on the Catholic calendar and videos of various events that took place at the store.

Queen of Angels serves all in accordance with its Catholic faith

77.     Queen of Angels believes that "[t]he dignity of the human person is rooted in his creation in the image and likeness of God."[1]

78.     Queen of Angels believes that, as divine image-bearers, every person is entitled to dignity and respect.

79.     Accordingly, Queen of Angels serves everyone, regardless of race, religion, sex, sexual orientation, gender identity, or any other protected status.

80.     Queen of Angels treats every customer with respect, even those who enter the store solely to protest or argue about Catholic doctrine.

---

[1] Catechism of the Catholic Church ¶ 1700 (2019), available at
https://bit.ly/3XSGXcB.

81.    But Queen of Angels cannot deny or contradict Catholic doctrine when speaking to or serving customers.

82.    Queen of Angels believes that it must honor God in how it interacts with others, including current and prospective customers and members of the public.

83.    In keeping with Catholic teaching, Queen of Angels believes that God created each person male and female and that biological sex is immutable.[2]

84.    And it believes that referring to a biological male as "she" or "Ms.," or a biological female as "he" or "Mr.," would be untruthful, misleading, and would violate the divine commandment not to bear false witness.

85.    Likewise, it believes that referring to any individual as "they," "ze," "ey," "Mx.," or any other pronoun, title, or neologism that is not consonant with the individual's biological sex would be untruthful, misleading, and would violate the divine command against bearing false witness.

86.    Thus, Queen of Angels employees cannot use pronouns or titles that do not align with an individual's biological sex.

---

[2] See, e.g., U.S. Conf. of Catholic Bishops, *Select Teaching Resources on Gender Theory / Gender Ideology* (Aug. 7, 2019), https://bit.ly/3HOq8Kv.

87.     But employees can and regularly do use pronouns and titles for customers when those pronouns or honorifics align with the customer's biological sex.

88.     When asked to use pronouns or titles that do not align with a customer's biological sex, Queen of Angels employees would respectfully decline and instead intentionally, respectfully, and consistently use form of address that does not contradict the customer's gender, such as the customer's first or last name.

89.     Queen of Angels has served customers who present as transgender, and it is therefore always at risk of receiving a request to use pronouns or titles that would violate the store's religious faith.

Queen of Angels desires to formalize its pronoun policy and publish content explaining its policy and its Catholic beliefs

90.     Queen of Angels believes that Catholic teaching on gender and sexuality is life-giving, consonant with the will of God, and leads to human flourishing.

91.     Queen of Angels also believes that many Catholics, many non-Catholic Christians, and many people in the wider community misunderstand Catholic doctrine on the issues of gender and sexuality.

92.     Queen of Angels desires to use its website, blog, and YouTube channel to teach and explain what the Catholic Church believes about human sexuality and the immutability of biological sex.

93.     Queen of Angels also wishes to be honest and transparent with its prospective customers about its Catholic beliefs on human sexuality to avoid the potential for misunderstanding.

94.     Likewise, Queen of Angels wishes to be honest and transparent with current and prospective employees about its policy on pronouns and titles to avoid any misunderstanding.

95.     Queen of Angels seeks to obey the biblical command to love others by being honest with current and prospective clients, current and prospective employees, and the public, by not lying or giving a false impression about what it will and will not provide to the customers, and by treating them with love, honesty, fairness, and excellence.

96.     Thus, Queen of Angels wishes to adopt its current pronoun and title practice into a formal, written policy binding the company, a copy of which is attached hereto as Exhibit A (the "pronoun policy") and to circulate that policy to current and future employees.

97.     Queen of Angels also desires to post an explanation on its blog about this pronoun policy and explain the Catholic beliefs behind this policy.

98.    The discussion that Queen of Angels would like to post is attached hereto as Exhibit B (the "pronoun blog post").

99.    Queen of Angels would also like to distribute printed copies of the pronoun blog post to customers free of charge in its physical store.

100.   In addition, Queen of Angels would like to create and publish other blog posts and YouTube videos that do not mention the store's pronoun policy but that discuss Catholic teaching about human sexuality, the creation of human beings as male and female, the immutability of biological sex, God's design for people to live consistent with their God-given sex, God's design for marriage to be exclusively between one man and one woman, and God's design for sexual activity to be practiced only between a man and woman who are married and not under other circumstances.

101.   These desires are in keeping with Queen of Angels' past practice of addressing other issues relevant to the Catholic faith, such as abortion, that are subject to public debate and misunderstanding.

102.   Posting about these issues is motivated by the store's Catholic beliefs and is part and parcel of Queen of Angels' religious exercise and expression.

Laws across country like Jacksonville's compel pronoun use

103.   There is an ongoing nationwide debate about gender identity and specifically whether the government can or should compel private businesses,

organizations, and individuals to use pronouns and titles consistent with their gender identity or biological reality.

104. If the former, the potential "pronouns" a person may request are effectively limitless. As the Fifth Circuit has noted, a person may request any number of neologisms, such as those reflected in the following chart.

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| (f)ae | (f)aer | (f)aer | (f)aers | (f)aerself |
| e/ey | em | eir | eirs | eirself |
| he | him | his | his | himself |
| per | per | pers | pers | perself |
| she | her | her | hers | herself |
| they | them | their | theirs | themself |
| ve | ver | vis | vis | verself |
| xe | xem | xyr | xyrs | xemself |
| ze/zie | hir | hir | hirs | hirself |

*United States v. Varner*, 948 F.3d 250, 257 (5th Cir. 2020) (quoting *Pronouns – A How To Guide*, LGBTQ+ Resource Center, University of Wisconsin-Milwaukee, https://uwm.edu/lgbtrc/support/gender-pronouns).

105. Nonetheless, governments at every level—from federal agencies to states to cities and counties—have promulgated laws and regulations seeking to compel the use of preferred pronouns and titles.

106.   Governments regularly interpret prohibitions on sex or gender-identity discrimination to compel the use of preferred pronouns and titles.

107.   For example, at the federal level, the U.S. Equal Employment Opportunity Commission (EEOC) has issued a Technical Assistance Document stating that employers regulated by Title VII *must* compel their employees to use their co-workers' preferred pronouns and titles.[3]

108.   At least 18 states have agreed with that interpretation and interpret their state laws the same way.[4]

109.   The EEOC's requirement to use preferred pronouns is based on statutory language that prohibits "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1).

---

[3] U.S. Equal Employment Opportunity Commission, *Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity*, https://bit.ly/3wKxTdZ.

[4] *See, e.g.*, Brief of Amici Curiae California, Colorado, Connecticut, Delware, District of Columbia, Hawai'i Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Washington in Support of Neither Party in *State of Tenn. v. Dep't of Educ.*, No. 22-5807, currently pending before the U.S. Court of Appeals for the Sixth Circuit (supporting Biden Administration interpretations of Title VII and Title IX to require the use of preferred pronouns), https://bit.ly/3HolNvV.

110.   And the EEOC has used its enforcement power to sue and obtain settlements from employers who fail to compel their employees to use preferred pronouns.[5]

111.   Courts have also interpreted the prohibition on sex discrimination in Section 1557 of the Affordable Care Act to compel healthcare facilities and professionals to use patients' preferred pronouns and titles.[6]

112.   The statutory language on which these decisions are based provides that an individual shall not, on the basis of sex, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

113.   At the state level, states like New York, Iowa, Colorado, New Jersey, Washington, Vermont, Massachusetts, and California all expressly

---

[5] U.S. Equal Employment Opportunity Commission, *Fact Sheet: Notable EEOC Litigation Regarding Title VII & Discrimination Based on Sexual Orientation and Gender Identity*, https://bit.ly/3RrIkwv.

[6] See, e.g., *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1099–1100 (S.D. Cal. 2017) (interpreting non-discrimination provision of Affordable Care Act to require medical provider to use preferred pronouns); *Smith v. Univ. of Rochester Med. Ctr.*, No. 17-cv-6781-CJS, 2017 WL 11428785, at *3–4 (W.D.N.Y. Dec. 28, 2017) (same).

compel businesses to use preferred pronouns under the guise of anti-discrimination laws.[7]

114.   For example, the New York State Division of Human Rights has issued guidance advising that New York's public-accommodations law compels businesses to use customers' preferred pronouns and titles.[8]

115.   It provides as an example that a medical-office receptionist would break the law if she referred to a biological male patient who identifies as female as "Mr. Jones" rather than "Ms. Jones."[9]

---

[7] *See, e.g.*, N.Y. Div. of Hum. Rts., *Guidance on Protections from Gender Identity Discrimination under the N.Y. State Hum. Rts. Law* 6–7 (2020), https://on.ny.gov/3A3b7k3; Wash. State Hum. Rts. Comm'n, *Sexual Orientation & Gender Identity Discrimination is Prohibited under Washington State Law* 2, https://bit.ly/3p5JyA8; Iowa C.R. Comm'n, Sexual Orientation & Gender Identity 2 (2016), https://bit.ly/3AMfOPm; U.S. Equal Employment Opportunity Commission, *Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity* (2021), https://bit.ly/3bo7fk8; N.J. Div. on C.R., *5 Things You Should Know about Discrimination and Harassment in Public Accommodations Based on Gender Identity or Expression* (2021),  https://bit.ly/3QMwegz; Colo. C.R. Comm'n Rules & Regs., 3 CCR 708–1, R. 81.6,  https://bit.ly/3An1nQq; Cal. Civ. Code § 51; *see Prescott*, 265 F. Supp. 3d at 1096–1099 (interpreting Unruh Civil Rights Act to apply to compel preferred pronouns); Vermont Hum. Rts. Comm'n, *Sex, Sexual Orientation, and Gender Identity: A Guide to Vermont's Anti-Discrimination Law for Employers and Employees*, https://bit.ly/3WP2BgE; Mass. Comm'n Against Discrimination Gender Identity Guidance (2016), https://bit.ly/3ji9IRd.

[8] N.Y. Div. of Hum. Rts., *Guidance on Protections from Gender Identity Discrimination under the New York State Hum. Rts. Law* 6–7 (2020), *available at* https://on.ny.gov/3A3b7k3.

[9] *Id.* at 6–7.

116.   The statutory language on which this guidance is based provides that it is unlawful for a place of public accommodation to "refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof" because of gender identity. N.Y. Exec. L. § 296(2)(a).

117.   In the same vein, the Iowa Civil Rights Commission has published guidance that Iowa's public-accommodations law makes it unlawful for businesses to use pronouns inconsistent with a person's "presented gender," regardless of biological reality.[10]

118.   This requirement is based on statutory language that prohibits "refus[ing] or deny[ing] to any person … the accommodations, advantages, facilities, services, or privileges thereof, or otherwise to discriminate against any person … in the furnishing of such accommodations, advantages, facilities, services, or privileges" because of gender identity. Iowa Code § 216.7(1)(a).

119.   Cities and counties across the United States also interpret antidiscrimination laws to compel businesses to use preferred pronouns and titles.

---

[10] See Iowa C.R. Comm'n, *Sexual Orientation & Gender Identity* 2 (2016), https://bit.ly/3AMfOPm.

120.   For example, the New York City Commission on Human Rights has issued enforcement guidance stating that the New York City Human Rights Law requires businesses "to use the name, pronouns, and title (e.g., Ms./Mrs./Mx.) with which a person self-identifies, regardless of the person's sex assigned at birth, anatomy, gender, medical history, appearance, or the sex indicated on the person's identification."[11]

121.   The statutory language on which this requirement is based provides that public accommodations may not "refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation" because of gender identity. N.Y.C. Admin. Code § 8-107(4)(a)(1)(a).

122.   Similarly, the San Francisco Human Rights Commission has issued guidance stating that businesses violate the city's public-accommodations law if they fail to use "forms of address and/or pronouns"

---

[11] *See* N.Y. City Gender Identity/Gender Expression: Legal Enforcement Guidance, https://bit.ly/3HLlr46; *Doe v. City of New York*, 42 Misc. 3d 502, 504 (N.Y. Sup. Ct. 2013) (holding that failing to use preferred pronouns violates State of New York and New York City law). *See also* D.C. Mun. Regs. tit. 4, § 808.

consistent with a customer's self-reported gender identity, regardless of biological sex.[12]

123.   The statutory language on which this requirement is based provides that it is unlawful to "deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any business establishment or public accommodation" because of gender identity. San Francisco Police Code § 3305(a)(1).

124.   Scholars and advocacy groups have also interpreted bans on gender-identity discrimination to require the use of preferred pronouns and titles.[13]

---

[12] *See* City and Cnty. of San Francisco Hum. Rts. Comm'n, *Compliance Guidelines to Prohibit Identity Discrimination* (2003), https://bit.ly/40lNfDu; *see also* Cambridge, *Mass. Hum. Rts. Comm'n Gender Identity & The Law: Public Accommodations Training*, https://bit.ly/3JB2P86.

[13] *See, e.g.*, Chan Tov McNamarah, *Misgendering*, 109 Cal. L. Rev. 2227 (2021) (arguing that bans on gender-identity discrimination prohibit "misgendering" by declining to use preferred pronouns or titles); Luke A. Boso, *Anti-LGBT Free Speech and Group Subordination*, 63 Ariz. L. Rev. 341 (2021); Kelli Rodriguez Currie, *If You Build It, "They/Them" Will Come: The Misgendering of Transgender Nonbinary Athletes Is Discrimination on the Basis of Sex*, J. of L. Aspects of Sport 312 (2021); ACLU Open Letter to Schools about Transgender Students and School Records (2020) (telling school officials that antidiscrimination laws require them to use students' preferred pronouns), https://bit.ly/3Dz8eZI.

<u>Jacksonville's law threatens Queen of Angels' ability to speak and operate
consistent with its Catholic beliefs</u>

125.   Over the past few years, Ms. DeTrude read news reports about
business owners across the country who were being sued and threatened with
severe penalties for declining to use an individual's preferred pronouns.

126.   Ms. DeTrude also became aware of recent debates about gender
identity in Florida and recent media reports about these debates, such as the
state's efforts to regulate medical care attempting to facilitate children to
change their gender and the state's effort to prohibit classroom instruction on
gender identity for young children.

127.   In Jacksonville, these debates have been intense. For example,
the local school board debated whether it would support the state's Parental
Rights in Education law for nearly eight hours, ultimately declining to
express support for the law.

128.   Ms. DeTrude was also aware of the hostile media and public
reaction to a local Baptist church publishing a statement concerning its view
that "God creates people in his image as either male or female, and that this
creation is a fixed matter of human biology, not individual choice."

129.   Because of the increased attention of such stories, and the
growing importance of this topic in our culture, in Florida, and indeed in
Jacksonville, Ms. DeTrude felt a growing need to formalize the bookstore's

policies related to gender identity and to discuss the topic of gender identity on her store's website, explaining her Catholic perspective on these issues.

130.   In light of these debates, Ms. DeTrude also took a closer look and realized that Jacksonville had passed a Human Rights Ordinance (the "law") banning gender-identity discrimination.

131.   The more Ms. DeTrude learned about the law, the more she realized that it threatened Queen of Angels' ability to run its business according to its faith and restricted what it could say on its website and in its blog.

132.   The objective of Jacksonville's law is to "eliminate discriminatory practices in public accommodations." Jacksonville, Fla. Code § 406.103.

133.   City law provides that it "shall be liberally construed so that the intent of the City Council may be effectuated." *Id.* at § 1.102(a).

134.   The law broadly defines discrimination to include any "difference in treatment," any "discriminatory practices," or any "unlawful … distinction" because of sex or gender identity. *Id.* § at 406.104(g).

135.   The law broadly defines gender identity to mean "the gender-related identity, appearance, or expression of a person." *Id.* at § 406.104(h).

136.   The law applies to "places of public accommodation," which are broadly defined as "any establishment, service, place or building which offers,

sells, or otherwise makes available to the public any good, service, facility, privilege or advantage." *Id.* at § 406.301.

137.   The definition of "places of public accommodation" includes "[a]ny retail … establishment." *Id.* at § 406.301(a).

138.   Queen of Angels operates a for-profit retail bookstore within the City of Jacksonville at which it offers and sells goods to the public.

139.   The bookstore is therefore a "place of public accommodation" subject to the law.

140.   From its retail location in Jacksonville, Queen of Angels also operates a for-profit website at which it offers and sells goods to the public.

141.   Thus, the website is also, according to Jacksonville law, a "place of public accommodation" subject to the law.

142.   The law contains three distinct clauses that threaten Queen of Angels' ability to speak and operate in accordance with its faith: the Privilege, Denial, and Unwelcome Clauses.

143.   The Privilege Clause makes it unlawful for public accommodations "[t]o refuse, withhold or deny to a person any services, access, advantages, goods, facilities or privileges of a public accommodation." *Id.* at § 406.201(a).

144. Queen of Angels' practice of only using preferred pronouns and titles that are consistent with a customer's biological sex and its written policy (Exhibit A) violates the Privilege Clause.

145. Other government entities have interpreted language like the Privilege Clause to compel the use of preferred pronouns and titles. *See* ¶¶ 103–23, *supra*.

146. In fact, the Privilege Clause even prohibits Queen of Angels from formally adopting its pronoun policy.

147. This Clause does so because the law defines "discrimination" broadly to prohibit any "difference in treatment," any "discriminatory practices," or any "unlawful … distinction" whether direct or indirect based on sex or gender identity, all of which would, in Jacksonville's view, include adopting the pronoun policy. *Id.* at § 406.104(g).

148. The law also prohibits Queen of Angels from adopting the pronoun policy by giving the Executive Director of the Jacksonville Human Rights Commission (the "Director"), the Jacksonville Human Rights Commission (the "Commission"), and court system the authority to investigate, punish, and enjoin any discriminatory practice that they find is "about to occur," such as a practice set forth in an official company policy. *Id.* at §§ 406.406, 406.409(b).

149. The Denial Clause meanwhile makes it unlawful for public accommodations "[t]o publish, circulate, issue, display, post or mail a communication, notice or advertisement to the effect that accommodations, services, goods advantages, facilities are denied to a person" because of a person's sex or gender identity. *Id.* at § 406.201(b).

150. The Unwelcome Clause makes it unlawful for public accommodations "to publish, circulate, issue, display, post or mail a communication, notice or advertisement to the effect that … the patronage of such person is unwelcome, objectionable, or unacceptable" because of a person's sex or gender identity. *Id.* at § 406.201(b).

151. Queen of Angels desires to post the pronoun blog post on its website and hand out copies of this post at its retail location to ensure that both its online and in-person customers are aware of its policy.

152. But posting the pronoun blog post online violates both the Denial and Unwelcome Clauses.

153. Distributing the pronoun blog post at the bookstore also violates both the Denial and Unwelcome Clauses.

154.   Indeed, in the nationwide debate over pronoun usage, proponents of preferred pronouns and titles often claim that declining to use them is tantamount to denying a person's existence.[14]

155.   But posting or distributing the pronoun blog post would possibly make someone feel unwelcome, objectionable, or unacceptable.

156.   Queen of Angels therefore cannot on its website or in its store post or explain its pronoun policy without substantial risk of violating the Denial and Unwelcome Clauses.

157.   If not for the Privilege, Denial, and Unwelcome Clauses, Queen of Angels would immediately formalize and adopt its pronoun policy, distribute that policy to employees, and publish and distribute its pronoun blogpost in its store and on its website.

158.   But because the Unwelcome Clause is also so broad and vague, Queen of Angels is unsure what else this Clause forbids beyond its pronoun blog post.

159.   For example, Queen of Angels would like to use the blog on its website to promote and explain its religious beliefs on human sexuality and gender identity without mentioning its pronoun policy—such as discussing its

---

[14] *See, e.g.*, Sabra L. Katz-Wise, Ph.D., *Misgendering: What it is and why it matters* (2021), http://bit.ly/40mx20u (claiming that declining to use preferred pronouns make people "feel invalidated and unseen").

Catholic beliefs about gender identity and human sexuality generally, including God's desire for marriage to be between one man and one woman, God's desire for people to act and identity consistent with their God given sex, God's prohibition on sexual activity outside the bounds of lifelong marriage between one man and one woman, and how these beliefs apply to current events and ongoing public debates.

160.  If not for the Unwelcome Clause, Queen of Angels would post on its store website about these topics.

161.  Although the Privilege, Denial, and Unwelcome Clauses restrict Queen of Angels' speech and operations, Jacksonville's law provides numerous exemptions in its public-accommodations section and elsewhere to allow entities to engage in discrimination, including exemptions related to certain types of private clubs, non-profit religious organizations, dress codes, single-sex spaces, small employers, bona fide occupational qualifications, and small landlords. *Id*. at §§ 402.107(i), 402.206(c), 406.302(a), (b), (d), (e), 408.201(a).

162.  But it provides no exemption for businesses like Queen of Angels to speak and operate in accordance with its sincerely held religious beliefs.

<u>Jacksonville's law uses aggressive enforcement mechanisms and penalties</u>
<u>that burden Queen of Angels's ability to speak and operate</u>

163.   Jacksonville law establishes the Commission as public body with authority to "receive and investigate, hold hearings on, seek to conciliate and act upon complaints alleging … a discriminatory public accommodations act." Jacksonville, Fla. Code § 60.105(b).

164.   The Commission accepts complaints against public accommodations from "[a]ny person aggrieved by an unlawful public accommodation prohibited by this chapter" as long as the aggrieved person files "a written, signed and sworn complaint with the Commission or its designee within 180 days after the alleged unlawful practice occurs." *Id.* at § 406.401(a).

165.   The word "person" includes not only individual human beings, but also "any governmental or political subdivision or public agency, any public or private corporation, any partnership, any firm, association or other organization, any receiver, trustee, assignee, agent, or other legal representative of any of the foregoing or any other legal entity." *Id.* at § 1.102(*ll*).

166.   And the term "aggrieved person" includes both those who have already been injured by an allegedly unlawful practice and those who believe that they will be injured by a discriminatory practice in the future. *Cf. id.* at

33

§§ 408.105(a) (definition of "aggrieved person" in fair housing section of law), 406.406 (requiring Director and Commission to evaluate whether violation of public-accommodation law "is about to occur"), 406.409(b) (allowing court to remedy violation of public-accommodation law that is "is about to occur").

167.   Thus, the Commission accepts complaints not only from individuals who have been discriminated against, but also from individuals, associations, interest groups, and others who believe they or their members may face discrimination in the future.

168.   The Commission is also permitted to "initiate its own investigations and hold public hearings to determine the facts" about instances of discrimination, regardless of whether a private individual or organization submitted a complaint. *Id.* at § 60.105(c).

169.   Once a complaint is filed, a burdensome investigatory and administrative process begins in which the Director has broad authority to enter the premises of the respondent, obtain whatever records the Director deems necessary, require the respondent and its employees to submit to interviews, force the respondent to answer interrogatories, and subpoena third parties, all backed up by the threat of fines and jail time for non-compliance. *Id.* at §§ 60.105(b), 406.401, 406.402, 406.403(d), 406.403.

170.   Following the investigation of the complaint, the "Commission or its designee shall make a finding related to probable cause." *Id.* at

34

§ 406.405(a), which includes a determination whether a violation of the law has occurred and whether a violation is about to occur. *Id.* at § 406.406.

171.  The Director prepares a finding related to probable cause at the conclusion of the investigation of the complaint, which includes a recommendation as to "the issues of liability …, affirmative action, reasonable accommodation, quantifiable damages, costs, attorney's fees, interest and civil fines." *Id.* at § 406.405(b).

172.  The Director's proposed findings, including any civil fines or other remedies levied by the Director, automatically become final unless the complainant or respondent requests a hearing within 10 days.  *Id.* at § 406.408(a).

173.  If a hearing is requested, the parties are entitled to full discovery under the Florida Rules of Civil Procedure. *Id.* § at 406.408(c).

174.  At the conclusion of any requested discovery, the parties proceed to a hearing before the Commission in which the parties must appear in person, submit evidence, and take testimony.

175.  At the conclusion of the hearing, "an adjudicative final order shall be issued and served on the parties." *Id.* at § 406.408(e).

176.  Once a final order occurs, the Commission has the authority to enforce the order. It can "issue temporary, interim, remedial and affirmative

35

orders and decisions necessary to the complete exercise of its powers and to seek injunctive relief, as necessary." *Id*. at § 60.105(j).

177.   And the Commission has "incidental powers necessary" to carry out its express powers to enforce the law. *Id*. at § 60.105(a)

178.   Penalties imposed by the Commission may include "affirmative action, reasonable accommodation, quantifiable damages, costs, attorney's fees, interest and civil fines." *Id*. at § 406.405(b)(6).

179.   There is no monetary cap on any of these potential penalties, including no monetary cap on the civil fines the Commission may impose.

180.   In addition, instead of pursuing relief before the Commission, an aggrieved person may file a civil action to enforce the law. *Id*. at § 406.409.

181.   In such civil action, a court may award broad relief, including "temporary or permanent injunctive and other equitable relief, temporary restraining order, actual and punitive damages, reasonable attorney's fees, interest, costs, or other [remedies]." *Id*. at § 406.409(b).

182.   The law does not cap any of these remedies, including the actual and punitive damages that may be awarded.

183.   In addition to the penalties available for violations of the law, the prospect of undergoing the lengthy, broad, and intrusive investigatory process outlined in the law burdens Queen of Angels' protected speech and religious exercise.

184.   Because of the breadth of the definition of "person," which includes associations and interest groups; the definition of "aggrieved person," which includes people who have never shopped at Queen of Angels; and the statutory authority to punish future violations of the law, nearly anyone could initiate the investigatory process by bringing a complaint.

185.   And the City has the authority to open an investigation of its own accord.

186.   Once an investigation begins, the Director has broad authority to force Queen of Angels—a very small business with only an owner and a few part-time employees—to expend substantial time, money, and other resources responding to subpoenas, document requests, interrogatories, and sitting for interviews, as well as hiring and paying legal counsel to protect its interests.

187.   At the conclusion of an investigation, the law permits the Director to drag Queen of Angels into an expensive and time-consuming conciliation process, and to go through a live hearing with full discovery if the Director reaches a conclusion adverse to the bookstore, all of which would require the bookstore to expend more resources.

188.   And the law allows a complainant to bring a civil action with all of the time and expenses that motions practice, discovery, trial, and appeals entail.

189.   And at the end of all of these processes, Queen of Angels is subject to civil penalties or damages, including punitive damages, that are not capped by the law.

190.   If not for the administrative burdens and penalties described above, Queen of Angels would immediately formalize and adopt its pronoun policy, distribute that policy to employees, publish and distribute its pronoun blogpost in its store and on its website, and discuss its Catholic beliefs about gender identity and human sexuality generally in its store and on its website. *See supra* ¶¶ 90–102

191.   Between October 1, 2017 and September 30, 2021, the Commission has received and investigated 935 complaints about alleged violations of the law.

192.   During that period, complainants received nearly $650,000 in monetary benefits as a result of the City's enforcement action, in addition to various non-monetary benefits procured for complainants by the City.

193.   During that period, the City issued probable-cause determinations in more than 20 cases.

194.   During that period, the City actively investigated and prosecuted public-accommodation complaints, including rendering at last one probable-cause determination in a public-accommodations case and achieving a $15,000 monetary recovery.

195.   On information and belief, the City continues to actively investigate and prosecute alleged violations of the public-accommodations portion of its law.

196.   On February 9, 2023, Queen of Angels apprised the City of its religious faith, its pronoun policy, and its desire to publish material advising customers and prospective customers about its pronoun policy. Queen of Angels asked the City to disavow enforcing its law against Queen of Angels for engaging in these activities.

197.   The City refused to disavow enforcement.

Jacksonville's law disproportionally burdens Queen of Angels compared to businesses expressing different views

198.   Although Jacksonville's law prohibits Queen of Angels from speaking and operating its business consistent with its religious belief that sex is immutable, the law allows other businesses that also qualify as public accommodations to speak and operate according to their view that sex can be changed.

199.   This distinction in treatment is based on the particular view that a business holds about human sexuality and gender identity.

200.   Many businesses in Jacksonville promote the view that sex can be changed and that businesses should be compelled to use preferred pronouns and titles.

201.   For example, over 700 Jacksonville businesses are members of the Jacksonville Coalition for Equality, which lobbied for and supported passage of Jacksonville's law.[15]

202.   Even many bookstores in Jacksonville promote the view that sex can be changed and that businesses should use preferred pronouns and titles.

203.   For example, Barnes & Noble, which has multiple retail locations in Jacksonville, openly promotes the view that sex can be changed.[16]

204.   Similarly, Femme Fire Books, a brick-and-mortar bookstore in Jacksonville, regularly promotes the view that sex can be changed. It hosts events promoting this view, such as the Queer Market, and promotes on its social media channels books that argue for this view, such as *The Pronoun Book* by Chris Ayala-Kronos and Melita Tirado, which teaches children to use preferred pronouns.

205.   Queen of Angels is in direct competition with the bookstores identified above and competes in the same general bookstore market in terms of competing for clients seeking to buy books.

206.   But Jacksonville's law imposes increased burdens on Queen of Angels that it does not on these other Jacksonville businesses (such as

---

[15] Jacksonville Center for Equality, https://jaxequality.org/.

[16] *See, e.g.*, Barnes & Noble (Twitter), https://bit.ly/3wRgLmI.

hindering Queen of Angels from adopting certain policies, addressing customers in certain ways, publishing certain content, and tailoring its website to appeal to certain views), which gives Queen of Angels' competitors an advantage and makes it easier for them to adopt policies, promote ideas, and tailor their websites consistent with their beliefs and able to attract their desired customers.

207.  Queen of Angels supports the right of these businesses to promote their views and operate their businesses in accordance with their views.

208.  Queen of Angels simply wants to enjoy the same freedom.

### Legal Allegations

209.  Queen of Angels is subject to and must comply with the law, including the Privilege, Denial, and Unwelcome Clauses.

210.  These clauses violate Queen of Angels' constitutional and statutory rights, and chill and deter Queen of Angels from exercising its constitutional and statutory rights.

211.  As a direct and proximate result of Defendant's violations of Queen of Angels' constitutional rights, Queen of Angels has suffered and will suffer ongoing irreparable harm, entitling Queen of Angels to declaratory and injunctive relief.

212.   Queen of Angels does not have an adequate monetary or legal remedy for the loss of its constitutional rights.

213.   Unless Defendant is enjoined, Queen of Angels will continue to suffer irreparable harm.

First Cause of Action
First Amendment: Free Speech, Association, Press, and Assembly

214.   The First Amendment's Free Speech, Press, and Assembly Clauses protect Queen of Angels' ability to speak, create, publish, sell, and distribute speech; to associate with others and with their messages for expressive purposes; to adopt and act on certain speech related policies; to decline to associate with others and their message for expressive purposes; to decline to create, publish, sell, and distribute speech; to be free from content, viewpoint, and speaker-based discrimination; and to be free from overbroad and vague restrictions on speech that give enforcement officials unbridled discretion.

215.   Queen of Angels' desired activities are forms of protected speech and expressive association.

216.   As applied to Queen of Angels, the Privilege Clause impermissibly compels Queen of Angels to speak messages with which it disagrees, discriminates against its speech based on viewpoint, and inhibits its ability to form expressive associations it desires to form and to avoid

expressive associations it desires to avoid, all by requiring Queen of Angels to use preferred pronouns and titles, regardless of biological sex, and stopping the bookstore from adopting and acting on its pronoun policy.

217.  The Privilege Clause also impermissibly restricts Queen of Angels' speech through the Denial Clause because the Denial Clause prohibits Queen of Angels from publishing statements describing certain actions defined to be illegal by the Privilege Clause.

218.  As applied to Queen of Angels, the Denial and Unwelcome Clauses impermissibly restrict the bookstore's speech based on content and viewpoint and inhibit its ability to form certain expressive associations and to avoid other expressive associations, all by prohibiting it from publishing its pronoun policy, the religious beliefs that undergird the pronoun policy, its religious beliefs concerning human sexuality and gender identity, and its pronoun blog post.

219.  The Unwelcome Clause is also facially unconstitutional because it is vague, overbroad, allows unbridled discretion, and is a content-based and viewpoint-based regulation that bans, chills, and burdens speech, association, and publication of speech.

220.  Queen of Angels has not and will not engage in certain protected speech because of the Privilege, Denial, and Unwelcome Clauses, including but not limited to the pronoun policy and the pronoun blog post.

221.  Accordingly, as applied to Queen of Angels, the Privilege, Denial, and Unwelcome Clauses violate the First Amendment's protections for free speech, free association, assembly, and free press.

222.  And the Unwelcome Clause facially violates the First Amendment's protections for free speech, free association, assembly, and free press.

Second Cause of Action
First Amendment: Free Exercise of Religion

223.  The First Amendment's Free Exercise Clause protects Queen of Angels' right to own and operate its business, to create or not create expression, to participate or not participate in religious exercises, to speak or not to speak, to associate or not to associate in accordance with their religious beliefs.

224.  The First Amendment doubly protects religious speech under the hybrid rights doctrine—the free exercise of religion in conjunction with other rights, namely the right to free speech.

225.  Queen of Angels exercises its religion under the First Amendment when it operates its business, drafts and publishes its blog, adopts policies consistent with its religious beliefs, and honestly communicates with its current and prospective customers about their Catholic beliefs, all of which are motivated by its religious faith.

226.   Queen of Angels also exercises its religion when it refuses to express a message that violates its religious beliefs.

227.   As applied to Queen of Angels, the Privilege, Denial, and Unwelcome Clauses substantially burden Queen of Angels' sincerely held religious beliefs by requiring it either to operate its expressive business in ways that violate its religious beliefs or to close its business; by preventing it from maintaining policies consistent with its religious views on human sexuality; by preventing its religiously motivated speech; by compelling speech that the store is religiously obligated to avoid; and by forcing its participation in activities prohibited by its religious beliefs.

228.   The Privilege, Denial, and Unwelcome Clauses do not force nonreligious businesses, or businesses with favored religious views, to choose between these same options when faced with requests to speak messages with which they disagree.

229.   The Privilege, Denial, and Unwelcome Clauses impermissibly prefer secular views over religious views, and certain religious views over others, by allowing those who own and operate public accommodations to express beliefs in favor of gender transition but not allowing them to express religious beliefs about the immutability of biological sex.

230.   The Privilege, Denial, and Unwelcome Clauses are not neutral or generally applicable because Jacksonville's laws contain several exemptions

45

and individualized assessments, yet Defendants refuse to grant a religious

exemption to Queen of Angels.

231.   Accordingly, as applied to Queen of Angels, Privilege, Denial, and

Unwelcome Clauses violate the First Amendment's protections to freely

exercise religion.

Third Cause of Action
Florida Statutory Free Exercise of Religion
(Fla. Stat. Ann. § 761.03)

232.   Under Florida law, the government shall not substantially

burden a person's exercise of religion unless it furthers a compelling interest

in a narrowly tailored way. Fla. Stat. § 761.03(1).

233.   As noted above, Queen of Angels has sincerely held religious

beliefs that govern its ability to own and operate its business, to create or not

create expression, to participate or not participate in religious exercises, to

speak or not to speak, to associate or not to associate in accordance with its

religious beliefs.

234.   Queen of Angels exercises its religion under Florida law when it

operates its business, drafts and publishes its blog, adopts policies consistent

with its religious beliefs, and honestly communicates with its current and

prospective customers about their Catholic beliefs.

235.   Queen of Angels' religious beliefs require that it follow its

pronoun policy, as using preferred pronouns and titles when those pronouns

and titles do not align with a customer's biological sex would violate Queen of
Angels' religious beliefs.

236.   Queen of Angels also exercises its religion when it refuses to
express a message that violates its religious beliefs.

237.   As alleged above, the Privilege, Denial, and Unwelcome Clauses
inhibit and curtail these religiously motivated practices.

238.   The Privilege, Denial, and Unwelcome Clauses therefore
substantially burden and threaten to burden Queen of Angels' free exercise of
religion with no legitimate, compelling, or narrowly tailored interest for doing
so.

Fourth Cause of Action
Fourteenth Amendment's Due Process Clause: Vagueness

239.   The Fourteenth Amendment's Due Process Clause prohibits the
government from censoring speech using vague standards that grant
unbridled discretion to government officials to arbitrarily prohibit some
speech and that fail to give speakers sufficient notice regarding whether their
desired speech violates Jacksonville's law.

240.   The Unwelcome Clause prohibits any place of public
accommodation from publishing, circulating, issuing, displaying, posting, or
mailing notices or advertisements, to the effect that "the patronage of such

person is unwelcome, objectionable, unacceptable" because of the person's
sexual orientation or gender identity. Jacksonville, Fla. Code § 406.21(b).

241.  These terms are overbroad because they prohibit speech that may
cause a person to feel unwelcome, objectionable, or unacceptable but is
constitutionally protected because the government lacks a compelling interest
in restricting it, and the restriction is not narrowly tailored.

242.  Queen of Angels, Defendant, and third parties of ordinary
intelligence cannot know what communications made on a public
accommodation's website, made on a public accommodation's social media
sites, made through mail, or made directly to prospective customers indicate
a person's "patronage" at a place of public accommodation is "unwelcome,
objectionable, unacceptable" and therefore cannot know what is prohibited by
the Unwelcome Clause.

243.  Defendants can use this vagueness, overbreadth, and
accompanying unbridled discretion to apply the Unwelcome Clause in a way
that discriminates against content, viewpoints, and actions Defendants
disfavor.

244.  Accordingly, facially and as applied to Queen of Angels, the
Unwelcome Clause violates the Fourteenth Amendment's Due Process
Clause.

**Prayer for Relief**

Queen of Angels respectfully requests that this Court enter judgment against Defendant and provide the following relief:

1.     A preliminary and permanent injunction to stop Defendant and any person acting in concert with them from:

      a.     enforcing the Privilege, Denial, and Unwelcome Clauses as applied to Queen of Angels' constitutionally protected speech, association, assembly, due-process, free-press, and religious-exercise rights; and

      b.     enforcing the Unwelcome Clause facially.

2.     A declaration that the Privilege, Denial, and Unwelcome Clauses have violated and continue to violate Queen of Angels' constitutional and statutory rights to engage in speech, association, assembly, press, and free exercise of religion as applied to Queen of Angels' constitutionally protected activities;

3.     A declaration that the Unwelcome Clause facially violates the United States Constitution's First Amendment protections for speech and press and the Fourteenth Amendment protections for due process;

4.     Nominal and/or actual damages to compensate Queen of Angels for past violations of its rights and the ongoing chill of its free-speech, press, expressive-association, assembly, due-process and free-exercise rights.

5.     That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

6.     That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

7.     That this Court award Queen of Angels' costs and expenses in this action, including reasonably attorneys' fees, in accordance with 42 U.S.C. § 1988;

8.     That this Court issue the requested injunctive relief without a condition of bond or other security required of Queen of Angels; and

9.     That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 22nd day of February, 2023.

Jonathan A. Scruggs*
Arizona Bar No. 030505
Henry W. Frampton, IV*
South Carolina Bar No. 75314
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax

By: *s/ Patrick Leduc*
Patrick Leduc
Florida Bar No. 964182
Law Offices of Patrick Leduc, P.A.
4809 E. Busch Blvd., Suite 204
Tampa, Florida 33617
(813) 985-4068
(813) 333-0424 Fax
Patrick.Leduc@ymail.com

jscruggs@ADFlegal.org
hframpton@ADFlegal.org

Rachel Csutoros*
Virginia Bar No. 97783
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, Virginia 20176
(571) 707-4655
(571) 707-4656 Fax
rcsutoros@ADFlegal.org

*Counsel for Plaintiff*


*\*Pro Hac Vice Admission Forthcoming*

## DECLARATION UNDER PENALTY OF PERJURY

I, Christie DeTrude, a citizen of the United States and a resident of the State of Florida, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this __22nd__ day of February, 2023, at Jacksonville, Florida.

Christie DeTrude