## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

THE CATHOLIC BOOKSTORE,
INC. d/b/a Queen of Angels Catholic
Bookstore,

     Plaintiff,

v.                                                                    Case No. 3:23-cv-192-TJC-MCR

CITY OF JACKSONVILLE,

     Defendant.

_____

## O R D E R

This case involves a challenge to Jacksonville's Human Rights Ordinance (HRO). The case is before the Court on Plaintiff Queen of Angels Catholic Bookstore's (QOA) Motion for Preliminary Injunction (Doc. 4) and Defendant City of Jacksonville's Motion to Dismiss (Doc. 23). The City responded in opposition to the preliminary injunction motion (Doc. 24) and QOA filed a combined response/reply to both motions (Doc. 32). Christian Family Coalition Florida, Inc. (CFC) also filed an amicus brief with the Court's permission. (Docs. 33, 37).[1] On May 15, 2023, the Court held a hearing on the motions, the record of which is incorporated by reference. (Doc. 42).

---

[1] CFC's Consent Motion to Have Filed Amicus Brief 3 Minutes After Deadline Because of Internet Difficulties in Rural Southern New Jersey (Doc. 40) is **GRANTED**.

# I. BACKGROUND

## A. Queen of Angels' Pronoun Policy

QOA is a Catholic bookstore located in Jacksonville. (Doc. 1 ¶ 14). QOA is suing the City because it argues that the City's HRO violates its constitutional rights. QOA desires to adopt a pronoun policy, <u>see</u> (Doc. 1-1), and "use its website, blog, and YouTube channel to teach and explain what the Catholic Church believes about human sexuality and the immutability of biological sex." (Doc. 1 ¶¶ 92, 96). One such blog post explains the pronoun policy. <u>See</u> (Doc. 1-2). QOA wishes to distribute printed copies of this blog post. (Doc. 1 ¶ 99). QOA also wishes to be "honest and transparent" with prospective customers and employees about "its policy on pronouns and titles." (Doc. 1 ¶¶ 93–94).

The pronoun policy states:

It is therefore the official policy of Queen of Angels Catholic Bookstore that owners, and employed staff, while working for the bookstore, <u>may only use pronouns and titles that align with the biologically originating sex of the person being referenced, whether the individual is a coworker, customer, or any member of the public visiting or interacting with the bookstore</u>. This would apply to in person, phone, online, or any other means of communications. The use of "gender neutral" pronouns or neologisms when requested by such referenced persons as noted above, to describe an individual's identity contrary to someone's biologically originating sex, e.g. "they," "ze," or "Mx.," is also prohibited.

Should someone interacting with the bookstore request a pronoun or form of address that would violate our policy, <u>employees should respectfully and charitably decline, and instead use a form of</u>

2

address that does not contradict someone's biologically originating sex, such as the person's first or last name.

(Doc. 1-1) (emphasis added). The policy does not require that the individual leave the store. Importantly, QOA's blog post explaining the pronoun policy also states: "[W]e serve customers of all gender identities, but we address all our customers based on their biological sex, as our Catholic beliefs require." (Doc. 1-2) (emphasis added). QOA alleges that it has served transgender customers in the past. (Doc. 1 ¶ 89).

## B. Jacksonville Human Rights Ordinance

The City passed the HRO in its current form in 2020, in which the City included sexual orientation and gender identity as protected classes. (Doc. 4-1 at 12–13); JACKSONVILLE, FLA., ORD. 2020-244-E. QOA argues that three provisions in the HRO prevent it from formalizing, publishing, and discussing its pronoun policy. QOA dubs these provisions the "Privilege," "Denial," and "Unwelcome" clauses. See (Doc. 1 ¶¶ 142–43, 149–50).

Jacksonville Municipal Code Section 406.201 states:

It shall be unlawful to engage in any of the following acts because of an individual's race, color, religion, ancestry, national origin, age, sex, sexual orientation, gender identity,[2] pregnancy, disability, marital status, or familial status.

---

[2] Gender identity is defined as "the gender-related identity, appearance, or expression of a person. Gender identity may be demonstrated by a person's consistent and uniform assertion of a particular gender identity, appearance or expression, or by any other evidence that a person's gender identity is sincerely held, provided, however, that gender identity shall not be asserted for any

3

(a) To refuse, <u>withhold or deny</u> to a person any services, access, advantages, goods, facilities or <u>privileges of a public accommodation</u> including the extension of credit **["the Privilege clause"]**; or

(b) To <u>publish</u>, <u>circulate</u>, issue, display, post or mail and [sic] communication, notice or advertisement to the effect that accommodations, services, goods [sic] advantages, facilities are <u>denied to a person</u> **["the Denial clause"]** or that the <u>patronage of such person</u> is <u>unwelcome</u>, objectionable, or unacceptable **["the Unwelcome clause"]**.

(Emphasis added).

Chapter 406 also provides limitations and exceptions. Section 406.301 defines public accommodations. Section 406.302 then provides:

(b) Nothing in this Chapter shall prohibit a religious organization, as defined in this Chapter, from limiting facilities and accommodations which it owns or operates for other than commercial purpose to persons of the same religion, or from giving preference to such persons;

. . . .

(f) With regard to <u>discrimination based on sexual orientation or gender identity</u>, this Part 3 shall not apply with regard to any action of, or decision made by, a <u>religious organization</u> as defined in this Chapter.

The definition of religious organizations was amended in Ordinance 2022-244-E and reads:

Religious Organization shall mean and include churches, synagogues, mosques, and schools of religious instruction and non-profit institutions or organizations affiliated therewith, as well as any "<u>religious corporation</u>, association or society." The phrase "<u>religious corporation</u>, association or society" shall be interpreted

---

improper, illegal or criminal purpose." § 406.104(h).

consistent with Section 2000e-(1)(a), United States Code. § 406.104(k) (emphasis added).

The HRO is enforced by the Human Rights Commission (the Commission). An aggrieved person may file a complaint, then the Commission investigates the complaint and makes a probable cause finding. §§ 406.401, 406.402, 406.405. If a complaint is sustained, it can lead to sanctions. § 406.405.

## II. DISCUSSION

On February 22, 2023, QOA filed its complaint against the City and an accompanying motion for preliminary injunction. (Docs. 1, 4). In the complaint, QOA alleges 213 factual and legal allegations, but QOA incorporates none of its allegations into the counts. <u>See</u> (Doc. 1). Further, the complaint alleges four counts:

- <u>Count I</u>: First Amendment: Free Speech, Association, Press, and Assembly. As-applied challenges to the Privilege, Denial, and Unwelcome clauses and facial challenge to the Unwelcome clause.

- <u>Count II</u>: First Amendment: Free Exercise of Religion. As-applied challenges to the Privilege, Denial, and Unwelcome clauses.

- <u>Count III</u>: Florida Statutory Free Exercise of Religion. (Fla. Stat. § 761.03).

- <u>Count IV</u>: Fourteenth Amendment's Due Process Clause: Vagueness. As-applied and facial challenges to the Unwelcome clause.

Id. Each count includes challenges to each of the three provisions at issue despite that each clause is distinct. In its motion to dismiss, the City asks the Court to dismiss the complaint as a shotgun pleading. (Doc. 23 at 18–21). The Court agrees with the City that QOA should be required to replead its complaint to correct these deficiencies. However, the Court will first discuss standing and ripeness.

### A. Standing

Before the Court can address the merits of QOA's claims, it must determine whether it has standing over each of the claims. Standing requires that the plaintiff show (1) an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) causation; and (3) redressability. See Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). QOA's alleged injury is concrete and particularized with respect to all the counts because it has alleged a deprivation of its First Amendment rights. See Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016) ("[W]e have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete. See, e.g., Pleasant Grove City v. Summum, 555 U.S. 460, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) (free speech); Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (free exercise)."). There is also no dispute that the alleged injuries are traceable to Chapter 406 and that any alleged harms would

be redressed if the offending provisions of Chapter 406 were struck down.

The remaining issue—as is true with most pre-enforcement actions—is whether QOA's alleged injuries are actual or imminent.[3] The Eleventh Circuit and the Supreme Court have both defined the appropriate standing analysis to apply in pre-enforcement cases:

> In Susan B. Anthony List v. Driehaus, the Supreme Court enumerated three criteria that, as a general matter, govern a plaintiff's standing to bring [a] pre-enforcement challenge[:] . . . The plaintiff must show (1) that he has "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) that his conduct is "arguably proscribed," and (3) that he is subject to "a credible threat of enforcement." 573 U.S. 149, 159, 162, 134 S. Ct. 2334, 189 L.Ed.2d 246 (2014) (cleaned up).

Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1119–20 (11th Cir. 2022).

In the context of First Amendment pre-enforcement cases, the Eleventh

---

[3] It is unclear at this stage whether QOA is a religious corporation exempt from the provisions in § 406.201, and whether QOA's desired actions (i.e., the adoption and publication of the pronoun policy) would be covered by § 406.201. However, for standing purposes, if QOA is "arguably" governed by § 406.201 and its actions are "arguably" prohibited by § 406.201, then the Court must proceed with the standing analysis. See Speech First, Inc. v. Cartwright, 32 F.4th 1110, 1122 (11th Cir. 2022) (holding the plaintiff had standing even though the university's attorney was not sure whether the speech the students wished to engage in would be prohibited by the policy); Harrell v. The Fla. Bar, 608 F.3d 1241, 1254 (11th Cir. 2010) (holding that to allege standing the plaintiff must show, among other things, that his speech "would arguably be affected by the rules" and that the rules "are at least arguably vague" as they apply to him (emphasis omitted)). The Court finds that it is arguable that QOA and its desired actions fall under § 406.201; therefore, it will continue with the standing analysis.

Circuit has emphasized "that '[t]he injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where [F]irst [A]mendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced.'" <u>Id.</u> at 1120 (quoting <u>Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale</u>, 922 F.2d 756, 760 (11th Cir. 1991)). "Litigants who are being chilled from engaging in constitutional activity suffer a discrete harm independent of enforcement, and that harm creates the basis for our jurisdiction." <u>Id.</u> (internal alterations and quotation marks omitted) (quoting <u>Dana's R.R. Supply v. Att'y Gen., Fla.</u>, 807 F.3d 1235, 1241 (11th Cir. 2015)). Consistent with those principles, the Eleventh Circuit held:

> [T]o determine whether a First Amendment plaintiff has standing [in the pre-enforcement context], we simply ask whether the "operation or enforcement," <u>Georgia Latino All. for Hum. Rts. v. Governor of Ga.</u>, 691 F.3d 1250, 1257 (11th Cir. 2012) (cleaned up), of the government policy would cause a reasonable would-be speaker to "self-censor[]," [<u>Wollschlaeger v. Governor, Fla.</u>, 848 F.3d 1293, 1305 (11th Cir. 2017)]—even where the policy "fall[s] short of a direct prohibition against the exercise of First Amendment rights," <u>Laird v. Tatum</u>, 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). In making that assessment, <u>the threat of formal discipline or punishment</u> is <u>relevant</u> to the inquiry, but it is not decisive. <u>The fundamental question under our precedent</u> . . . <u>is whether the challenged policy "objectively chills" protected expression.</u>

<u>Id.</u> (emphasis added).

It is unclear at this juncture whether any enforcement action would ever

occur against QOA; however, the question is whether QOA has alleged enough to show that Chapter 406 could objectively chill speech. The provisions in Chapter 406 are all enforced through the same process where an aggrieved person may file a complaint and the Commission investigates the complaint before making a probable cause finding. §§ 406.401, 406.402, 406.405.

The Privilege clause directs that the following actions are prohibited:

> To <u>refuse</u>, <u>withhold or deny</u> to a person any services, access, advantages, goods, facilities or privileges of a public accommodation including the extension of credit . . . .

§ 406.201(a). The Privilege clause does not objectively chill speech because on its face the Privilege clause does not relate to speech. It is not arguable that formalizing or posting a pronoun policy is prohibited by the Privilege clause. QOA has alleged no other injury with respect to the Privilege clause. It has not alleged that it was required by § 406.201(a) to serve people that it did not want to. In fact, QOA states that it will not withhold or deny service to anyone. <u>See</u> (Doc. 1-2).

On the other hand, the Denial and Unwelcome clauses specifically prohibit certain types of speech:

> To <u>publish</u>, <u>circulate</u>, <u>issue</u>, <u>display</u>, <u>post or mail</u> and [sic] communication, notice or advertisement to the effect that accommodations, services, goods [sic] advantages, facilities are denied to a person or that the patronage of such person is unwelcome, objectionable, or unacceptable.

§ 406.201(b). QOA alleges that it has not formalized its pronoun policy nor

published the policy on its website or social media pages because it is concerned about enforcement of the HRO against it. (Doc. 1 ¶¶ 157, 160, 190). Considering the lenient standard in speech cases and that the Commission has the power to enforce Chapter 406, as alleged, QOA has shown that its injuries are actual or imminent with respect to the Denial and Unwelcome clauses. Having now found that QOA's alleged injuries are sufficiently actual or imminent, all elements of standing are satisfied.

### B. Ripeness

Next, the Court must determine whether QOA's claims challenging the Denial and Unwelcome clauses are ripe.

To determine whether a claim is ripe we must evaluate: (1) "the fitness of the issues for judicial decision"; and (2) "the hardship[4] to

---

[4] As explained by the Eleventh Circuit,

In Ohio Forestry, the Supreme Court discussed the types of hardship that might cause a case to be considered ripe. 523 U.S. at 733–36, 118 S.Ct. at 1670–71. First, the Court noted that hardship might be present where a policy results in "adverse effects of a strictly legal kind." Id. at 733, 118 S.Ct. at 1670. The Court explained that such effects are not present if the challenged policies "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations." Id. Second, the Court stated that an "important consideration" in modern ripeness cases is whether the challenged policy "inflicts significant practical harm upon the interests that the [plaintiff] advances." Id. at 733–34, 118 S.Ct. at 1670. Such "practical harm" is not likely to be present where a plaintiff "will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain." Id. at 734, 118 S.Ct. at 1670.

the parties of withholding court consideration." <u>Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta</u>, 219 F.3d 1301, 1315 (11th Cir. 2000) (internal quotation marks omitted). In applying the fitness and hardship prongs we must consider the following factors: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." <u>Ohio Forestry Ass'n, Inc. v. Sierra Club</u>, 523 U.S. 726, 733, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998); <u>see also</u> <u>Ala. Power Co. v. Fed. Energy Regulatory Comm'n</u>, 685 F.2d 1311, 1315 (11th Cir. 1982) (listing four similar factors).

<u>Beaulieu v. City of Alabaster</u>, 454 F.3d 1219, 1227 (11th Cir. 2006). Review of a suit's ripeness is more permissive when a plaintiff asserts a violation of a First Amendment right; even more so when invoking a core First Amendment right. <u>Id.</u> at 1227–28 (differentiating the case from other ripeness cases because it involved core political speech instead of sexually explicit speech or commercial speech).

QOA's facial claim is ripe because, as the Eleventh Circuit in <u>Club Madonna</u> stated: "A facial challenge presenting a purely legal argument . . . 'is presumptively ripe for judicial review' because that type of argument does not rely on a developed factual record." <u>Club Madonna, Inc. v. City of Miami Beach</u>,

---

Finally, the Supreme Court said that a court should consider whether the plaintiff "pointed to any other way in which the [policy] could now force it to modify its behavior in order to avoid future adverse consequences . . . ." <u>Id.</u> at 734, 118 S.Ct. at 1671.

<u>Pittman v. Cole</u>, 267 F.3d 1269, 1280–81 (11th Cir. 2001).

924 F.3d 1370, 1380 (11th Cir. 2019) (quoting <u>Harris v. Mexican Specialty Foods, Inc.</u>, 564 F.3d 1301, 1308 (11th Cir. 2009)).

Regarding QOA's as-applied claims, the Eleventh Circuit has previously held that constitutional claims are not ripe when there is a process that provides an opportunity for an advisory opinion regarding the conduct in question. <u>See</u> <u>Harrell v. The Fla. Bar</u>, 608 F.3d 1241, 1261–65 (11th Cir. 2010). Here, Chapter 406 does not have an advisory opinion process by which QOA could discern whether its policy violates Chapter 406 before any enforcement action commences. Even though the City itself has not indicated an intent to enforce Chapter 406 against QOA, an aggrieved individual could nonetheless file a complaint and trigger the investigative process. That investigative process could require QOA to respond to interrogatories and subpoenas. §§ 406.402, 406.403. The investigative process alone constitutes a hardship. <u>See</u> <u>Pittman</u>, 267 F.3d at 1280–81 (describing the varying types of hardship).

While additional facts regarding how the Commission would interpret §§ 406.201 and 406.302 would be helpful to the Court, requiring QOA to go through this administrative process before allowing it to bring its claims would be burdensome. QOA is currently in a position where it must choose between not acting or acting and opening itself to a burdensome investigative process and possible sanctions. <u>Cf.</u> <u>id.</u> at 1280 ("We have recognized that '[p]otential litigants suffer substantial hardship if they are forced to choose

between foregoing lawful activity and risking substantial legal sanctions,' . . . ."). True, the Court's consideration of QOA's claims might interfere with the City's administrative process because the Commission has not had a chance to determine whether QOA's actions would fall under § 406.201 or if the religious exception applies to QOA; however, the potential hardship to QOA outweighs the other factors. QOA's claims regarding the Denial and Unwelcome clauses are ripe.

## C. Religious Exception

In researching the case, the Court came across the religious exception in § 406.302(f) (and the incorporated definition of "religious organization" which includes a "religious corporation" in § 406.104(k)). A week before the preliminary injunction hearing, the Court asked the parties to file short briefs regarding whether QOA qualified for the religious exception. (Doc. 36). The parties discussed this issue at the hearing, but the uncertainty surrounding standing and ripeness rightfully dominated the discussions.

Having now decided, at this juncture, that QOA has standing to bring certain claims and that those claims are ripe, the Court can consider, on the merits, whether the religious exception in § 406.302(f) applies to QOA. The parties did not discuss this issue in their original briefs, and their supplemental briefs were short. The parties acknowledged at the hearing that if the religious exception applies, then § 406.201 does not pertain to QOA as it relates to gender

13

identity and sexual orientation policies. Because this is a threshold issue, the Court directs QOA to file a motion for summary judgment limited to the religious exception issue.

"In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." <u>Siegel v. LePore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam) (internal alterations and quotation marks omitted). At this point there is too much uncertainty as to whether the religious exception in § 406.302 applies to QOA and whether QOA can show § 406.201 is unconstitutional either facially or as applied to QOA. Therefore, QOA has not shown "a substantial likelihood of success on the merits" entitling it to a preliminary injunction. <u>In re Sealed Search Warrant & Application for a Warrant by Tel. or Other Reliable Elec. Means</u>, 11 F.4th 1235, 1248 (11th Cir. 2021). Accordingly, it is hereby

**ORDERED:**

1. Plaintiff's Motion for Preliminary Injunction (Doc. 4) is **DENIED without prejudice**.

14

2. Defendant's Motion to Dismiss (Doc. 23) is **GRANTED**. Plaintiff's Complaint (Doc. 1) is **DISMISSED without prejudice**. Plaintiff shall file an amended complaint no later than **July 7, 2023**.[5]

3. Plaintiff shall file a motion for summary judgment limited to the religious exception issue no later than **July 28, 2023**. Defendant shall respond no later than **August 25, 2023**. Plaintiff shall reply no later than **September 1, 2023**. The parties may engage in limited discovery regarding the religious exception issue if necessary.

**DONE AND ORDERED** in Jacksonville, Florida the 9th day of June, 2023.



TIMOTHY J. CORRIGAN
United States District Judge

ckm
Copies:

Counsel of record

---

[5] Because of the threshold religious exception issue, the Court finds that it is most efficient to resolve this issue before proceeding with the rest of the case. See Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1366 (11th Cir. 1997) ("[D]istrict courts enjoy broad discretion in deciding how best to manage cases before them.") (citation omitted). Thus, the City is not required to respond to the complaint in the interim. See FED. R. CIV. P. 56(b) ("Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.").